**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GENTLE LASER SOLUTIONS, INC., LIBERTY LIBERTY MED SPA, INC., and KEVIN T. CAMPBELL,<br><br>Plaintiffs<br><br>v.<br><br>SONA INTERNATIONAL CORP., SONA LASER CENTERS, INC., THOMAS R. NOON, DENNIS R. JONES, COOKIE JONES, JAMES H. AMOS, JR., HEATHER ROSE, CAROUSEL CAPITAL, INC., CYNOSURE, INC., and JOHN DOE # 1, in his capacity as Personal Representative and/or Executor of the Estate of HORACE W. FURUMOTO, Deceased<br><br>Defendants | 1:06-CV-00665 (NLH) (JS)<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

Plaintiffs, Gentle Laser Solutions, Inc. ("GLS"), Liberty Med Spa, Inc. ("LMS") and Kevin T. Campbell ("Campbell"), by and through their undersigned counsel, complain of the Defendants as follows:

THE PLAINTIFFS

1. Plaintiff GLS is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 220 North Warner Road, Suite 121, King of Prussia, PA 19046. GLS operates a Sona Med Spa in King of Prussia, Pennsylvania (the "First Franchise").

2. Plaintiff LMS is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at The Shops at Liberty Place, 1601 Chestnut Street, Philadelphia, PA 19103. LMS operates a Sona Med Spa in the City and County of Philadelphia (the "Philadelphia Franchise").

3. Plaintiff Kevin T. Campbell is an adult individual who maintains a business address at 220 North Warner Road, Suite 121, King of Prussia, PA 19046. Campbell is the sole shareholder of GLS and LMS. Campbell maintains a personal residence at 5022 Camburn Road Plymouth Meeting, PA 19462 and at 2402 Avalon Avenue, Avalon, New Jersey.

THE DEFENDANTS

4. Sona International Corporation ("SIC") is the parent of Sona Laser Centers, Inc. ("SLC) and is, upon information and belief, a Virginia corporation with its principal place of business in Franklin, Tennessee.

5. Sona Laser Centers, Inc. ("SLC") is a Virginia corporation which, at all times relevant hereto, maintained a principal place of business in Chesapeake, Virginia.

6. Dennis R. Jones ("D. Jones") is the founder and President of SLC. He is a citizen and resident of Virginia.

7. Cookie Jones ("C. Jones") is a former officer of SLC. She is a citizen and resident of Virginia.

8. Thomas R. Noon ("Noon") was Chief Financial Officer of SLC from 2002 until August 2004, and since September 2004 has been strategic projects officer. He is a citizen and resident of Virginia.

9. James H. Amos, Jr. ("Amos"), a citizen and resident of Tennessee, is the Chairman and Chief Executive Officer and, upon information and belief, a principal owner of SLC. Amos became chairman of SLC in approximately March 2004 when he, together with Carousel Capital, bought a substantial ownership interest in the company.

10. Heather Rose ("Rose"), a citizen and resident of Tennessee, is Chief Operating Officer of SLC, and has held that position since approximately April 2004. Rose is subject to jurisdiction in this District by reason of having offered and sold franchises to residents of this state.

11. Carousel Capital, Inc. ("Carousel") is an investment banking firm that, upon information and belief, is headquartered in Charlotte, North Carolina.

12. Cynosure, Inc. ("Cynosure") is a Delaware corporation with a principal place of business at 10 Elizabeth Drive, Chelmsford, MA 01824. Cynosure develops and markets aesthetic treatment systems that are used to remove unwanted hair.

13. Defendant John Doe # 1 is, upon information and belief, the personal representative and/or executor of the Estate of Horace W. Furumoto (the "Estate"). Horace Furumoto ("Furumoto") was, at all relevant times, the president or Chief Operating Officer of Cynosure.

RELATIONSHIP BETWEEN THE PARTIES

14. SIC and SLC are Franchisors within the meaning of Section 56:10-3 of the New Jersey Franchise Practices Act (the "Act").

15. As set forth more fully below, Campbell is the sole shareholder of GLS and LMS, which operate two Sona Med Spas (the "Franchised Business"). Campbell, GLS and LMS are Franchisees within the meaning of Section 56:10-3 of the Act.

16. Plaintiffs are parties to a certain Area Development Agreement which requires Plaintiffs to open a minimum of four (4) Sona Med Spa franchises in a particular Designated Marketing Area (the "DMA").

17. Plaintiffs' DMA specifically includes the area known as Southern New Jersey which comprises Mercer, Burlington, Camden, Gloucester, Atlantic, Salem, Cumberland and Cape May Counties (the "New Jersey Territory") and thus qualifies as a "franchise" pursuant Section 56:10-3 of the Act. At all times relevant hereto, Plaintiffs specifically bargained for the exclusive rights to develop the Franchised Business in the New Jersey Territory and did direct business activities into the State of New Jersey.

18. Said business activities includes, without limitation, entering into advertising contracts with New Jersey persons targeting New Jersey consumers, broadcasting radio advertisements into the State of New Jersey, marketing Plaintiffs' services in the State of New Jersey to New Jersey consumers, deriving substantial revenue from sales of goods and/or services to New Jersey residents and taking other significant steps toward the establishment of a franchised place of business within the meaning of Section 56:10-3 of the Act..

19. The Act applies to these proceedings inasmuch as the Franchise Agreement, Area Development Agreement and certain related agreements, all of which are in the possession, custody and control of the Defendants, contemplates or requires Plaintiffs to establish or maintain a place of business within the State of New Jersey.

20. Plaintiffs' New Jersey related revenues have exceeded $35,000 for the twelve months next preceding the institution of this suit pursuant to the Act and more than 20% of the Plaintiffs' gross sales are derived from such franchise.

21. Defendants Noon, D. Jones, R. Jones, Amos, Rose, Carousel, Cynosure and Furumoto (the "Control Defendants") are Franchisors for purposes of this action within the meaning of the Act inasmuch as each of the Control Defendants is a "person" within the meaning of *N.J. Stat. Ann.* § 56:10-3(b) of the Act who controlled or effectively controlled the activities of SIC and SLC.

22. It is alleged, upon information and belief, that at all times relevant hereto, Defendant Cynosure maintained a position on Sona's Board of Directors and that Cynosure materially influenced Sona's policies and business practices including, without limitation, the policies and business practices complained of herein.

23. At all times relevant hereto, Cynosure effectively controlled Sona within the meaning of *N.J. Stat. Ann.* § 56:10-3(b).

## OPERATIVE FACTS

24. In or around the late fall of 2002, Kevin T. Campbell responded to an advertisement posted by Defendants on a web site called www.bizbuysell.com

which is maintained by the Wall Street Journal. Through this website, Defendants offered for sale a Sona Laser Center located in Charlotte, North Carolina.

25. In response to the advertisement, Campbell was put in touch with Thomas R. Noon who was the Chief Operating Officer and Chief Financial Officer of the advertised business. During these discussions, Noon made statements and representations to Campbell about the success of the Charlotte facility and the unique nature of Sona's laser hair removal services, which are more fully identified below.

26. For personal reasons, Campbell decided not to relocate his family to Charlotte, North Carolina at that time and he informed Noon that he was not interested in exploring the purchase of a Sona Laser Center in Charlotte, North Carolina. At the time of this discussion, Noon did not suggest to Campbell that Sona, as an organization, intended to offer Sona franchising opportunities.

27. Several months later, Noon contacted Campbell and informed him that based on the success of its corporate-owned centers, Sona had decided to franchise its business model. Noon further informed Campbell that laser hair removal ("LHR") was suited for franchising and that the franchise model enhanced an already tremendous business opportunity. Noon also stated that as a start-up franchisee, Campbell would get in on the ground floor with virtually limitless earning potential.

28. At this and subsequent conversations, Noon and Jones informed Campbell that the liquid capital requirements for entering the franchise network

was $350,000. Campbell represented to Noon and Jones that he had limited available liquid capital and that to make the investment of over $350,000 he would have to leverage virtually everything that he and his wife Tashya owned. Jones and Noon indicated that if Campbell made the requested investment, he would receive exclusive rights to a Designated Marketing Area which covered an area of Southeastern Pennsylvania as well as Southern New Jersey (the "DMA").

29. Plaintiffs believe and therefore aver that it had always been the intention of Noon and Jones to sell as many franchises as quickly as possible without regard for the franchisee's likelihood of success or viability in order to enable Noon and Jones to quickly flip the franchise to a new owner for a lucrative price before the fundamental flaws in the system materialized and became known.

## THE FALSE REPRESENTATIONS

30. Based on the aforementioned representations, Campbell and his wife Tashya met with Defendants Dennis Jones (SIC's Chairman and CEO), his wife Patricia Jones, a/k/a "Cookie" Jones, (SIC's Vice President of Design and Development) and Thomas R. Noon who disseminated information (or more accurately misinformation) concerning the Sona opportunity. During these meetings, these Defendants made statements and representations to the Plaintiffs which are more fully set forth below and upon which the Plaintiffs relied to their great harm and detriment.

31. In total, between Campbell's first telephone contact with Sona in the fall of 2002 up through February 12, 2003, Defendants made representations to Campbell which included, without limitation, the following:

(a) That SLC had developed a proven and "great" business model for the permanent removal of unwanted hair through FDA approved laser technology and had the "***fastest, most powerful laser technology and offered services at much lower fees than competitors.***" ***Operations Manual, Introduction, p. 11, Section 1, pp. 12-13, 27***.

(b) That SLC had a proprietary **<u>patent-pending "revolutionary" concept</u>**, that removed 97 percent of hair in all body areas permanently in five (5) treatments. The system, according to defendants, resulted in hair removal in "less time with better results" and that ensured that franchisees had "a compelling competitive advantage." ***UFOC, Item 1, page 2, Operations Manual, Section 1, pp. 18, 21***.

(c) That SLC's system was unique and provided the prospective franchisee with a distinct competitive advantage because unlike the competition, SLC had developed a method of treating individuals of **all skin types** and **all hair types.** See, **UFOC, Item 1, page 2, Operations Manual, Section 1, p. 27**.

(d) That approximately 50% of Sona's customers were male. **Operations Manual, Section 1, p. 12**.

(e) That SLC had acquired the **<u>exclusive</u>** rights to a device known as a Chromotest, which measured melanin levels in the skin and assisted nurses in selecting custom laser settings for each client thus improving results. ***Operations Manual, as amended in 2/05 – Sales Script, p.3.***

(f) That in addition to the best lasers, Sona's patent-pending concept enabled it to treat unwanted hair at precisely the right times in the hair growth cycle in order to be effective. According to Defendants, no one else had this proprietary treatment protocol. ***UFOC, Item 1, pp. 103; Operations Manual, Section 1, p. 12***.

(g) That the combination of the concept known as the "Sona Concept" with the specific Apogee Laser Technology developed by Cynosure created a unique LHR method which gave the

Sona franchisee a distinct competitive advantage over the competition. ***UFOC, Item 1, pp. 1-3;***

(h) That Sona had created an effective and financially viable system and that the success of the business was largely dependent on the abilities and attention of the franchisee. ***UFOC 6/11/02, Item 19, Exhibit G.***

(i) That under Sona's business model, a franchisee could expect that the business would become profitable at a break even point of $55,000 per month in sales and that profitability would steadily increase as sales increased to the point that at sales levels of $100,000 or more, the franchisee could expect earnings in excess of $30,000 (a margin of approximately 30%). ***UFOC 6/11/02, Item 19, Exhibit G.***

(j) That the cost of outfitting a Sona Laser Center to conform to the franchise standards was approximately $100,000 and that Sona had personnel experienced in real estate negotiations and construction management who would liaise with landlords to ensure a timely and cost-effective build-out. ***UFOC 6/11/02, Items 7, pp. 12-15.***

PLAINTIFFS' RELIANCE

32. In reliance upon the representations made by SLC, SIC and its duly authorized representatives and agents (both actual and/or ostensible) Campbell decided to purchase the rights to become the area developer of Sona Laser Centers in the Philadelphia DMA. For his first franchise location Campbell selected King of Prussia, Pennsylvania a suburb of Philadelphia. To that end, Campbell incorporated GLS and on February 21, 2003, GLS entered into a Franchise Agreement with SLC (the "First Franchise Agreement").

33. The aforesaid representations were repeated by SLC through its Operations Manual which contained specifications, standards procedures and rules applicable to the System. Pursuant to Section 12.3 of the First Franchise Agreement, the complete Operations Manual, together with its misrepresentations

and material omissions, was incorporated into the First Franchise Agreement ad made part of the said agreement as if fully stated therein.

34. Contemporaneously with the execution of the First Franchise Agreement, GLS executed an Area Development Agreement, pursuant to which Plaintiffs agreed to develop at least 4 centers and to pay at least the following fees:

A. A franchise fee for each center of $39,500;

B. An area development fee of $30,000;

C. A training and set up fee for the first franchise $75,000;

D. A fee for advertising materials of $12,500; and

E. A software management systems fee of $25,000.

35. In addition, SLC required, and GLS agreed to pay a monthly royalty referred to as the Laser Placement, Servicing, Marketing and Consulting Fee (the "LCP") which started at 27.5% of monthly gross sales. In addition to the LCP, other fees were paid for advertising, audits, transfer of the franchise and other services or events.

36. As part of the First Franchise Agreement, on or about March 4, 2003, GLS by and through Campbell, executed an Apogee Laser Security Agreement (the "Laser Agreement"), a copy of which is in the possession, custody and control of the Defendants. The agreement was countersigned by Defendant Furumoto on behalf of Cynosure, Inc. Under the Laser Agreement, Cynosure agreed to provide GLS with Cynosure Lasers and related cooling units at certain sales benchmarks as well as maintenance.

37. As of March 4, 2003, Cynosure held a significant undisclosed equity stake in the Sona franchise.

38. As of March 4, 2003, Plaintiffs believe and therefore aver that Cynosure was a closely held company with aspirations of raising substantial capital through a public offering which, if successful, would result in a tremendous financial windfall for its then-management.

39. Sona had represented to Plaintiffs that the laser technology required by the Franchise was the fastest and most powerful laser on the market. However, Son concealed from prospective franchisees the fact that Cynosure held a substantial equity stake in the franchise.

40. Had the information been revealed, the objectivity of Sona's choice of laser would have been called into question and prospective franchisees would either not enter into a franchise agreement or demand, at the outset, permission to use a more appropriate and effective laser.

41. Sona, by and through the named defendants, and Cynosure conspired to conceal Cynosure's equity stake in Sona for as long as possible.

42. Cynosure relied on the revenue stream generated by the Sona franchise, which mandated the exclusive use of Cynosure equipment, to launch a public offering which, in turn, made millions for its then management at the expense of the plaintiffs herein.

43. In addition to the aforementioned active and intentional concealment, in which Cynosure played an active role, Plaintiffs believe and therefore aver that Cynosure and Furumoto were aware of the significant problems with the Sona

System including, without limitation, the unreasonable standards of performance imposed by Sona and, despite said knowledge, entered into the Laser Agreement as a means of obtaining significant revenues from the placement and operation of Cynosure lasers by Plaintiffs herein.

44. Between the spring of 2003 and January 1, 2004 Plaintiff worked diligently to open his first Laser Hair Removal Center. GLS opened its first Sona Laser Center in King of Prussia, Pennsylvania on December 28, 2003. In all, the costs of the initial investment for the First franchise from the date the Franchise Agreement was signed to the date the business first opened its doors was $750,000.00, an amount significantly higher than the written representations made by the Defendants as to the costs of entering the system.

45. But for Defendants' affirmative misrepresentations and active concealment of material information, which were gradually discovered between the time Plaintiffs opened their first franchised business location and the present time, Plaintiffs would not have entered into the system or made an investment of such magnitude. The misrepresentations and concealment consisted of, inter alia, the following:

DIFFICULTY IN TREATING NON-CAUCASIAN CUSTOMERS

46. Sona's Cynosure Apogee lasers were incapable of eliminating unwanted hair on non-Caucasian customers including, without limitation, customers of an African American, Latino, Indian, Asian, Middle Eastern and some European backgrounds. After entering into the First Franchise Agreement, SLC informed GLS and Campbell that to treat persons with the aforementioned

backgrounds and skin characteristics, GLS would have to lease a special instrument called the Nd:YAG laser (referred to as the "YAG"). The YAG was supposed to prevent skin hyperpigmenting. However, this laser was not provided to GLS in advance of the opening thus preventing GLS from providing services to a substantial portion of its customer base and effectively wasting Plaintiffs' advertising dollars.

47. In a market with significant ethic diversity, Sona failed to disclose the fact that the Nd:YAG laser, which was the only laser available to safely treat non-Caucasian customers, was substantially less effective. With the YAG, clients of the aforementioned backgrounds would require 25-50% more treatments than their Caucasian counterparts on the Apogee. In addition, treatment times were significantly longer per visit. Despite this dramatic discrepancy, the Sona Operations Manual required GLS to sell to all customers treatment packages consisting of five (5) treatments. As a result, given the fact that a YAG treatment took more time and that more YAG treatments were necessary to reach goals established by SONA, GLS was presented with an absolute crisis: On the one hand, not only would the YAG not generate profits but it caused actual losses. On the other, GLS could not and would not put itself into the position of not providing services on such sensitive grounds and therefore, continued to offer services at breakeven or a loss, all the while paying royalties required in the FIRST Franchise Agreement.

<u>THE PROBLEMS WITH MELADINE</u>

48. According to Defendants, the district difference between Sona and other competitors in the Laser Hair Removal industry was Sona's ability to treat all skin tones and all hair colors.

49. This difference was emphasized with respect to customers who had white, gray or blonde hair. Sona's lasers remove hair by transmitting energy through the hair to the actual hair follicle which is then permanently disabled. Dark hair absorbs the energy well and allows it to be transferred to the hair follicle without damaging (burning) the surrounding skin. Light hair (i.e. white, gray or blonde hair) do not absorb the energy well and therefore, more energy is required to accomplish the same goal. As a result, the increased or excess energy has a likelihood of burning the skin surrounding the hair follicle.

50. Both before and at the time Plaintiffs executed the First Franchise Agreement, Plaintiffs were informed that unlike its competitors, Sona had solved this problem by introducing an agent called Meladine. According to Sona, customers with white, gray or blonde hair needed merely to apply Meladine before a treatment.

51. In actuality at or around the time that Plaintiffs opened the FIRST Franchise, it was learned that the protocol for effective use of Meladine was outlandishly tedious and that only the most dedicated user could/would follow the protocol. The regime entailed first shaving the area to be sprayed. Then the customer would have to spray the area with Meladine 4-6 times per protocol and allow the area to air dry in between sprays. No towel drying was allowed. The customer would then have to repeat this protocol 2 times per day.

52. To be effective, the customer was required to begin the regimen four (4) to six (6) weeks before their first treatment began and continue the regimen on a daily basis. Therefore, in preparation for the first LHR treatment, a customer with white, gray or blonde hair would have to devote an extraordinary amount of time to applying and re-applying Meladine.

53. When discussing Meladine, the Defendants created the false impression that the product could be applied in a manner similar to sun tan lotion. Defendants never disclosed the rigorous protocol which was virtually impossible to sell to customers and actively concealed the true protocol for treating many minorities. As a result, contrary to Defendants' representations, GLS' ability to sell services to an important target market was significantly impaired.

THE LASER SETTINGS

54. When marketing the franchise to Campbell, Defendants indicated that LHR was a relatively painless way to permanently remove unwanted hair.

55. Once GLS became operational it had occasion to call upon Cynosure to service GLS' lasers. In response to the service request, Cynosure sent technicians and/or representatives to service and/or repair Plaintiff's lasers pursuant to the Apogee Laser Security Agreement, which GLS executed directly with Cynosure as part of the FIRST Franchise Agreement.

56. During services visits Campbell and the Cynosure technicians discussed the laser settings recommended by Sona both during training and through its Operations Manual. Cynosure technicians disclosed to Campbell that

as to the first treatment, Sona was using artificially low settings which had very little effect on the customer to decrease the likelihood that a customer would cancel the treatment package for reasons of pain or discomfort. The Cynosure technician further indicated that he was instructed by Cynosure not to discuss the issue of laser settings with Sona Franchisees. Upon information and belief, the aforesaid instruction originated with Defendant Furumoto and was based upon an agreement reached between Cynosure and Furumoto on the one hand and SIC, SLC and/or some or all of the Control Defendants on the other hand.

57. By the time Plaintiff realized these fundamental problems which were material and which should have been disclosed prior to the execution of the FIRST Franchise Agreement, Campbell entered the system, paid significant set up and training fees, paid (and overpaid) for a buildout of the King of Prussia franchise, and committed to an Area Development Agreement which required him to open a total of four (4) centers in the next five (5) years, which included the New Jersey Area.

CONCEALMENT OF AFFILIATION

58. Unbeknownst to Plaintiffs, Defendants concealed other problems with the system and omitted from their representations (including obligatory disclosures made in the UFOC) other facts which were material to the transaction.

59. For example, during the relevant time period, Cynosure – the manufacturer of the Apogee lasers used by the Plaintiffs as per the Franchise Agreement – was a significant shareholder in Sona Laser Centers, Inc. and

exercised effective and active control over SIC and/or SLC's business activities. Defendants made no mention of this relationship and failed to disclose any affiliation between Sona and Cynosure in the UFOC.

60. Knowledge that the recommended laser manufacturer held a significant equity stake in the Franchised Business was material to the Plaintiffs' decision-making process and was required to be disclosed under Federal law and under New Jersey law.

<u>FALSE ECONOMICS</u>

61. As discussed more fully below, Defendants concealed that the system upon which the Franchised Business was based suffered from certain critical economic flaws which were not disclosed to the Plaintiffs. Specifically, under the Defendants' business model, a Franchised Business after reaching $55,000 per month in sales, a Franchised Business would become profitable. However, unbeknownst to Plaintiffs, the entire business model was based on the erroneous representation that permanent laser hair removal could be achieved in an average of five (5) applications over a span of 12-18 months. In fact, as discussed more fully below, this representation was false and in certain cases dozens of applications were required to achieve desired efficacy levels. These additional applications created additional overhead and labor costs which completely eroded profits promised by the Defendants.

62. In addition Defendants had affirmatively misstated material facts regarding how Defendants recognized revenue and/or income and the long-term economic viability of the Franchised Business. SLC recommended that

treatments be sold in packages of five (5) which would be prepaid by the customer or financed through a financing intermediary recommended by the franchisor. Plaintiffs believe and therefore aver that Defendants, when making earning claims, recognized or realized 100% of the package as income for cash flow purposes. In fact, only 20% of that income should have been realized because Defendants maintained a tail liability of at least four (4) treatments which had been paid for but which had been performed. Accordingly, for this and other reasons discussed herein, Defendant's earning claims were artificially inflated and did not account for significant ongoing liabilities to customers. Moreover, the cash flow statements were manipulated to create the impression of profitability.

63. Plaintiffs believe and therefore aver that Defendants Cynosure and Furumoto were aware of the was aware of these false representations and material

AMOS TAKES OVER

64. In or about March 2004, only three months after GLS opened its doors, Amos, together with Carousel, purchased a substantial interest in SLC or SIC. Amos became chairman, and installed his daughter, Heather Rose, as COO. Dennis Jones and Thomas Noon continued as executive officers of SLC. The change in ownership came a tremendous surprise to Campbell who had just opened his first franchise and who was under the impression, based on statements made by the Defendants herein between November 2002 and March 2003 that Defendants Jones, Noon were committed to building the Sona

enterprise together with Campbell and the other franchisees who had invested substantial capital based on Defendants' assurances.

65. On or about March 27th or 29, 2004, SLC hosted a conference of franchisees at which Amos was introduced as the new Chairman of SLC and representatives of Carousel were introduced as substantial investors. Amos and Carousel announced to the assembled franchisees, including Campbell, that Amos was the former CEO of Mailboxes, Etc., former Chairman of the International Franchise Association, a man of high ethical standards and an executive of proven leadership ability. Under Amos, SLC was going to grow very rapidly; SLC would provide franchisees with national advertising support; the methods that Amos had used to grow Mailboxes, Etc. would be used for Sona, and Sona would become a "household name;" within a short period of time, the company would make a public offering of its stock. Carousel was portrayed as a substantial investment bank with deep experience in franchising because it was a large equity owner of Meineke Discount Mufflers.

66. Upon taking over SLC and SIC, Defendants continued to market and sell franchises for Sona Laser Centers with the same representations that had been made to Campbell and GLS.

67. In written communication to the franchisees dated September 29, 2004, Defendants stated that "during the last three months, we have completed much analysis of the business and have relied on individual discussion with many of you as well as group discussions with your Franchise Advisory Council." Accordingly, for this and other reasons, plaintiffs believe and therefore aver that

Amos, Rose and Carousel were privy to the falsehoods, misrepresentations and omissions identified herein all of which were material to Plaintiffs' decision to enter into, continue with and/or renew their franchise agreements with Defendants.

68. Plaintiffs believe and therefore aver that the Amos team discovered that the entire Sona System was predicated on a complete and utter fraud as previously discussed and as discussed elsewhere in this Complaint. Instead of disclosing the fraud, the Amos team put their interests ahead of the Plaintiffs and continued to make false and misleading statements and to omit and/or conceal material facts.

69. Specifically, and without limitation, Plaintiffs believe and therefore aver that as of September 29, 2004, the Amos team was aware that Sona's claim that unwanted hair could be eliminated in five treatments was blatantly false and that, in fact, Sona's own records showed that as many as ten (10) or twelve (12) treatments may be necessary to achieve the expected results and, in some instances, as many as twenty-two (22) treatments were required to achieve procedure efficacy of less than 90%.

70. Instead of disclosing this fact to the Plaintiffs herein or to the other franchisees, the Amos team disseminated a new policy recommending that the first treatment (which was called an evaluation treatment and which was administered on reduced settings for the comfort of a first-time customer) be replaced with a full strength treatment. The Amos team failed to disclose that this policy was driven by knowledge that Sona's claims as to LHR not be

accomplished in five (5) treatments. Instead, the Amos team created the false impression that the policy change was driven by market forces and customer demand for greater efficacy in fewer treatments.

71. Moreover, having recognized the fundamental problem associated with "YAG Customers", the Amos team proposed a new pricing structure under which non-Caucasian customers who were not suitable candidates for the Cynosure lasers, would be charged higher fees than their Caucasian counterparts because the YAG lasers took longer and required more than five (5) treatments to reach acceptable efficacy levels.

72. In a telephone call regarding the new policies, Campbell stressed that a disparate pricing strategy based on skin color may have devastating public relations (and other) implications in Plaintiffs' exclusive territory, which enjoys rich ethnic diversity.

73. Despite having knowledge (actual and/or constructive) of facts which cast the viability of the system into doubt, SIC, SLC, Amos, Rose and Carousel embarked upon a program to deny, obfuscate and conceal the truth about the Sona technology, the Sona financial model and the Sona franchise. As a result, Campbell and GLS continued to invest in and work on the Sona Laser Center in King of Prussia, Pennsylvania, even though SLC, Amos, Rose and Carousel knew or should have known that it had been misrepresented to Campbell and GLS and they were under a duty to disclose the truth to them.

74. The duty that Defendants had to make complete disclosure of the truth of the Sona system, technology and franchise to Campbell and GLS arose,

first, from their positions as control persons of the franchisor; second, from the fact that they had knowledge superior to that of the franchisees, and knew that Sona had misrepresented the franchise system to the franchisees. Third, Amos in particular had held himself out as being an exceptionally honest and ethical person, and publicly undertook to adhere to the highest ethical standards, which standards would require him to immediately disclose to the franchisees the truth of the Sona system. In violation of all of these obligations, Amos, Rose and Carousel deliberately suppressed the truth for their own personal gain, knowing that it would severely damage the franchisees, including GLS.

SLC LAUNCHES SONA MEDSPA

75. In pursuit of their scheme and conspiracy to cover up the truth about the Sona franchise, SIC and SLC continued to sell franchises on the same basis as before and continued to repeat those false representations on their website, on other websites, in person and in written literature.

76. The Amos takeover was finalized in or about August of 2004. Shortly thereafter, Defendants announced to the franchisees that they were launching a new concept, "Sona MedSpa," that would replace the Sona Laser Center concept and that would offer skin rejuvenation in addition to hair removal.

77. The "MedSpa" concept was first advertised as an improvement to the existing laser hair removal system. Later, or about January 6, 2005, SLC announced that the Med Spa concept was in reality the offering of a new franchise system and to that end, SLC sent all existing franchisees, including GLS, a new purported "Offering Circular" describing the new "Sona MedSpa"

franchise. In conjunction with this offering, the Defendants announced that developers, such as GLS, would only be able to fulfill their development obligations to open new franchises by doing so under the new "Med Spa" franchise agreement. In addition, SLC made it clear that if GLS did not sign the Agreement, Sona would compete with GLS in its territory with respect to other services offered by a Med Spa, which would be withheld from an ordinary Laser Center.

78. Defendants also announced that the conversion from a Sona Laser Center to a MedSpa would address financial problems experienced by most franchisees who were either struggling to reach profitability or were experiencing significant losses. According to Defendants, Sona was abandoning the revenue share model which called for monthly LCP charges of between 17.5% – 27.5%. Instead, the Amos Defendants indicated that the new system would operate on a 10.5% royalty for all LHR sales.

79. Defendants represented to Plaintiffs that between the modifications made to the system by the Defendants and the revamped revenue structure, Sona would be more profitable than ever. In fact, while Plaintiffs were only obligated to develop four (4) centers in five (5) years, Defendants expected that current and prospective franchisees would develop as many as one center every six months or upwards of thirty (30) centers during a fifteen year franchise term.

80. However, despite the reduction in LHR-related franchise fee, under the MedSpa system, Plaintiff were required to both purchase their existing lasers and purchase costly maintenance contracts in order to keep these lasers

operational. In all, this required an up-front cash commitment of in excess of $300,000 as well as significant long term maintenance obligations. In short, to the extent that the shift from the "revenue share" to the "royalty" structure produced any cost savings, such savings (if any) were substantially less tangible then represented by Defendants.

81. In addition, in or around February 2005, Defendants included a balance sheet in the UFOC for the period ending June 30, 2004. According to the balance sheet, in the first six months of 2004, the franchisor had realized in excess of $1.3 million dollars in profits and that total stockholder equity was nearly $3.5 million dollars. In actuality, as learned by the Plaintiffs only after signing the Second Franchise Agreement, SLC had lost approximately $2 million dollars in the second half of 2004. SLC was aware of these huge losses when it disseminated the MedSpa UFOC but failed to disclosure this information to the Plaintiffs.

82. Campbell and others met with Defendants at a closed door meeting during an event called the "Sona Family Reunion" held in February, 2005. Instead of disclosing problems with the franchise as well as the franchisor's true financials, Amos and Rose informed Campbell that: (a) the Sona was in good shape and was ready, willing and able to launching and supporting the new MedSpa franchise; (b) if GLS wanted to reduce its ongoing expenses, it had to sign the new agreement, which would replace the old agreement; (c) SLC would no longer support the "Sona Laser Center" model, so signing up on the Med Spa

agreement was the only way to receive continuing support; (d) most of the franchisees had agreed to sign the new agreement.

83. Believing these representations to be true and in reliance upon them, as well as the omissions of defendants and the business reputations of the Amos Defendants, Campbell executed the new form of franchise agreement on February 15, 2005 (the "Second Franchise Agreement").

84. Like the First Franchise Agreement, the new Second Franchise Agreement incorporated by reference the specifications, standards, procedures and rules applicable to the System which were contained in the Operations Manual. See, Second Franchise Agreement at § 10.3. Upon information and belief, the Operations Manual had not been modified in significant respect between 2003 and 2005 and the misrepresentations and material omissions in the Operations Manual were incorporated into and made part of the Second Franchise Agreement.

<u>THE FRAUD IS REVEALED</u>

85. Plaintiffs operated two franchise locations through the summer of 2005. In or around the summer of 2005, Plaintiffs began to learn of significant customer complaints concerning the efficacy of LHR treatments. Specifically, customers who had purchased treatment packages consisting of five (5) procedures, were complaining that they achieved substantially less than permanent laser hair removal in the 93-97% range. Some dissatisfied customers demanded refunds. Others demanded that they receive additional treatments to eliminate hair consistent with Sona's promises.

86. As a result, Plaintiffs were required to refund costly treatment packages or offer services for free, all of which had a material and adverse impact on the Plaintiffs' business operations.

87. During this same time, based on his own investigation and from information received from other franchisees who had commenced legal proceedings against the defendants herein, Plaintiffs discovered the following fraudulent information:

(a) The business model was built on false assumptions and accordingly did not work. In fact, Defendants had grossly overstated the centers capacity for profitability, the efficacy of the treatments and the integrity of the system as a whole. Moreover, as soon as Plaintiffs bought out the "fastest and most powerful lasers" during the laser center and MedSpa conversion, Sona authorized the use of non-Cynosure lasers.

(b) SLC's claim that there was an "SLC pending patent" for the Sona Concept was completely false. In fact, upon information and belief no Patent application had ever been filed and even if it had, Sona's "proprietary" treatment schedules were based on decades old research and standard practice in the hair removal industry and therefore non-patentable. In addition, regardless of the schedule followed, the centers operated by Plaintiffs and all other Sona centers polled confirmed that the Cynosure lasers and treatment protocols that Sona Laser Centers instructed all centers to use were not capable of removing 93 to 97 percent of all hair in five treatments- regardless of hair color or thickness. In addition, as previously discussed, they were also ineffective to remove hair that was blonde, red or grey, or to remove dark hair on dark skin. Indeed, even under the best conditions of dark hair and light colored skin, more than five treatments were usually required. In fact, Sona's own internal information showed that on many areas of the body, 7 to 12 treatments were required and in certain cases as many as 22 treatments were required to reach efficacy rates of less than 90%. Dr. George Wilson, Sona's national medical director, had in fact generated an internal analysis that confirmed this fact. SLC's false representations regarding the proprietary "Sona Concept" have caused significant damage to the reputation and the business success of Plaintiffs and have had a detrimental

effect on Plaintiffs' operations including the need for providing additional free treatments and/or refunding payments of numerous clients.

(c) Because of the complete absence of promised competitive advantages – proprietary technology, ability to treat all types of skin and hair, or to remove hair in five treatments – the Sona system could not be marketed on the basis of Sona's claims (with any honesty) and therefore provided no uniqueness or real differentiation or meaningful source of advantage in the extremely competitive Philadelphia market. In addition, as discussed supra, the system as sold was functionally incapable of delivering consistent results to customers with darker skin types or lighter hair colors, thus precluding Plaintiffs from marketing goods and services to a significant portion of the target market.

(d) That male customers did not comprise approximately 50% of Sona's customers. In facts, the breakdown was that the Chromotest device was neither developed by nor unique or exclusive to Sona.

(e) Significant portions of the system involved insider transaction which were not disclosed. Cynosure, Sona's preferred laser provider, actually held an equity stake in Sona, a fact that was not disclosed as required in the UFOC. In addition, Both Meladine and Sonacaine were manufactured by a separate Creative Technologies, Inc., a company owned and operated by Defendant Dennis Jones, who used the franchisees as captive customers, forcing them to buy ineffective products. In fact, the Chromotest manufacturer was capable of selling and did, in fact, sell this product to Plaintiff's competitors thus further diluting the system's competitive advantage (if any).

(f) That Sona and its lasers were not approved for "permanent hair removal", a term routinely used by Sona when selling the franchises and its goods and services. Rather, Sona's lasers were approved for "permanent hair reduction" which is less than permanent removal. Sona intentionally downplayed and blurred the distinction between these terms when selling the franchises to create the impression that Sona had a true competitive edge. In fact, the FDA had not approved the use of "permanent hair removal" in connection with LHR because such claims could not be substantiated.

(g) The representations that Sona Laser Centers operated at a 55 percent margin and reached break-even at revenue levels of $44,000 to $50,000 per month with 55% profit beyond this revenue level were false. The company-owned Sona Laser Centers in operation at the time of the offering did not achieve the earnings levels purported by Sona. Also, the earnings claims in the offering circular were highly deceptive and premised upon a deliberate distortion and disregard of generally accepted accounting principles and disregard of the Franchisees' obligations. The "margin," "break even" and earnings claims were based on recognizing all cash received in advance for treatments as revenue, without accounting for the cost of providing continuing services. For example, if a customer paid $1,000 in January for five treatments to be delivered over the course of the following year, SLC treated the full $1,000 as income earned in January, but accounted only for the expense of services rendered in January (*e.g.*, one treatment) in calculating the "margin." Generally accepted accounting principles require that only the portion of the fee attributable to the services rendered in January – *e.g.*, $200 for one treatment – be recognized as income. Defendants, however, presented their earnings claims without disclosure of these facts. The result was that cash flow margins and profits were grossly overstated.

(h) In addition, when using corporate owned centers as examples of protected earnings and expenses, Sona failed to disclose that certain costs of operation were being paid not through the actual centers but were rather absorbed by the parent. As a result, Sona's revenue and expense projections in its UFOC were artificially low and materially false.

(i) Because the economic model that Sona had described did not account for the liabilities of providing continuing treatments (and completely ignored liability for any treatments beyond five) Plaintiffs encountered increasing liability as time went on.

88. Plaintiffs believe and therefore aver that following the acquisition, the Amos Defendants discovered all or some of the fraudulent representations and material omissions set forth above. Instead of making disclosures, Defendants concealed and obfuscated the truth through a number of policy changes. For example, in response to the fundamental problem of not being able to effectively

treat non-Caucasian customers, the Amos Defendants recommended a price increase for all customers treated with the YAG. When the Amos Defendants learned that effective treatments could not be achieved in approximately five (5) treatments, they concealed the information and instead suggested eliminating certain commitments from the sales script all the while maintaining that market forces created a demand for greater efficacy in fewer treatments. When franchises were loosing money as a result of the fundamental misrepresentations, the Amos defendants disseminated a policy change suggesting that where the law permitted, it was no longer company policy to use nurses. Now, LHR could be performed by anyone, as long as not prohibited in the center's jurisdiction.

89. The effect of these policy changes was to shift the focus away from the fraud and continue to conceal the Defendants' unlawful acts while collecting revenue. In fact, unlike the model purchased by the Plaintiffs herein, the true model had (a) no patentable or proprietary systems; (b) no cutting edge lasers; (c) no exclusive testing devices; (d) no ability to treat all skin types; (e) no ability to treat all skin colors; (f) no ability to permanently <u>remove</u> hair; and (g) no ability to permanently <u>reduce</u> hair to suggested efficacy levels in five (5) treatments. On top of that, Sona's last policy directive that recommended the elimination of nurses, watered down what little was left of the original model. This is not the business that Plaintiffs were sold.

90. As a result of the Defendants' fraud, misrepresentations, fraudulent omissions and failures to fulfill their obligations, Plaintiffs herein have been significantly harmed as set forth below.

COUNT ONE
(Violation of the New Jersey Franchise Practices Act)
Plaintiffs v. Cynosure, Inc. and John Doe # 1

91. Plaintiffs repeat and re-allege each and every prior and subsequent paragraph of this Complaint as though set forth here in full.

92. By reason of the aforesaid, which consists of willful and knowing misrepresentations and the concealment of material information which Cynosure and Furomoto were duty-bound to disclose, Cynosure engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations as well as the concealment, suppression and omission of vital material facts which affected not only Plaintiffs' willingness to enter into a franchise relationship but also the manner in which Plaintiffs provided services to customers.

93. The fraud materially benefited Cynosure and Furumoto who used the revenue stream generated by the fraudulent activity to launch Cynosure's public offering and which currently causes Cynosure stock to trade at approximately ten (10) times earnings.

94. Plaintiffs seek damages as provided by Section 56:10-10 of the Act including without limitation, reasonable attorney's fees and costs of the action.

COUNT TWO
(Violation of the New Jersey Consumer Fraud Act)
Plaintiffs v. Cynosure, Inc. and John Doe # 1

95. Plaintiffs repeat and re-allege each and every prior and subsequent paragraph of this Complaint as though set forth here in full.

96. The New Jersey Consumer Fraud Act creates a cause of action for unconscionable commercial practices in connection with the sale or advertisement of any merchandise or real estate. *N.J.S.A.* 56:8-2.

97. By virtue of the aforesaid conduct, Defendants violated CFA.

98. Plaintiffs have invested in excess of $1,000,000 into the development of Sona Laser Centers and/or Sona Med Spas in accordance with the aforementioned franchise agreements.

99. Plaintiffs are entitled to recover the damages sustained by them as a result of Defendants' violations plus costs and attorneys fees and such other relief as may be available to Plaintiffs.

COUNT THREE
(Common Law Fraud)
Plaintiffs v. Cynosure, Inc. and John Doe # 1

100. Plaintiffs repeat and re-allege each and every prior and subsequent paragraph of this Complaint as though set forth here in full.

101. Defendants made material misrepresentations of fact, material omissions of fact, and engaged in deceptive acts and practices, as set forth above.

102. Said material misrepresentations included, without limitation: (a) concealing its true interest in the Sona franchise; (b) concealing the shortcomings of its laser equipment; (c) concealing the shortcomings in the Sona system of which Cynosure and Furumoto were aware; and (d) instructing service personnel to suppress material information about laser settings.

103. These Defendants knew that their representations, omissions, suppressions and deceptive acts were false; they engaged in this deceptive activity

knowing that their words and actions were false and misleading; and with the intent that Plaintiffs rely upon them.

104. Plaintiffs reasonably relied upon these defendants' representations, omissions, suppressions and other deceptive acts to their great harm and detriment.

105. These Defendants' representations were false, and as a result of Plaintiffs' reliance upon Defendants' representations, Plaintiffs have each suffered damages in excess of one million dollars.

106. Defendants acted intentionally, with deliberate disregard of the rights of GLS, LMS and Campbell, with the knowledge that their fraud would severely injure the franchisees while it enriched them. Defendants' acts were reprehensible and egregious, to the extent that they should shock the conscience of the Court.

107. Plaintiffs are entitled to rescind the agreements, and to recover rescission damages in excess of one million dollars, plus punitive damages in excess of $10 million or such amount as shall be sufficient to deter such conduct in the future.

COUNT FOUR
(Negligent Misrepresentation)
Plaintiffs v. Cynosure, Inc. and John Doe # 1

108. Plaintiffs repeat and re-allege each and every prior and subsequent paragraph of this Complaint as though set forth here in full.

109. Defendant Cynosure had a business relationship with plaintiffs such that they were required, in conscience and good faith, to take due care to ensure

that the information communicated to plaintiffs was truthful, accurate and reliable, and not omit or suppress any material information.

110. Plaintiffs relied upon the information furnished by Defendants in the belief that it was truthful and reliable.

111. Defendants failed to exercise reasonable care in the information that they provided to Plaintiffs and in fact unreasonably provided plaintiffs with unreliable and misleading information, which plaintiff relied upon to its detriment.

112. As a result of plaintiffs' reasonable reliance upon defendants' misleading information, plaintiffs have sustained damages of no less than one million dollars.

COUNT FIVE
[Unjust Enrichment – Disgorgement]
Plaintiffs v. Cynosure, Inc. and John Doe # 1

113. Plaintiffs repeat and re-allege each and every prior and subsequent paragraph of this Complaint as though set forth here in full.

114. Defendant Cynosure realized significant revenue from, inter alia, the LCP fees paid by the Plaintiffs.

115. By reason of the aforesaid, Defendant Cynosure and Furumoto – its then CEO and stockholder – were unjustly and unfairly enriched to the detriment and at the expense of the plaintiffs herein.

116. The enrichment of the defendants is fundamentally unjust and equity requires that all moneys realized by Defendants as a result of their unlawful conduct be disgorged to the plaintiffs herein.

COUNT SIX
(Civil Conspiracy)
Plaintiffs v. Cynosure, Inc. and John Doe # 1

117. Plaintiffs repeat and re-allege each and every prior and subsequent paragraph of this Complaint as though set forth here in full.

118. Defendants Cynosure and Furomoto, through concerted action designed to defraud the plaintiffs herein, embarked upon and engaged in an unlawful civil conspiracy with the other defendants named herein and with inside and outside service personnel, designed to unlawfully to suppress the truth with respect to Sona Laser Center Franchises, the efficacy of Sona treatments and the fact that the system, as marketed and sold, imposed unreasonable standards of performance upon franchisees.

119. Said Defendants carried out this conspiracy by falsely denying that there were any problems with the Sona system; by blaming problems on the franchisees; by undertaking to launch the "Sona Med Spa" system and issuing an unlawful and unregistered offering circular as a cover-up for the grave deficiencies of the Sona Laser Center system.

120. The objective of the conspiracy was to conceal for as long as possible Cynosure's affiliation and the fundamental problems associated with Cynosure's role in the illegal scheme to allow Cynosure to ramp up for and complete its public offering.

121. As a result of Defendants' conspiracy, Plaintiffs were prevented from learning the truth when it should have been discovered and when Plaintiffs could have ceased investing in the Sona system; and because of the conspiracy,

Plaintiffs continued to invest in, build and open its Sona franchises when, if defendants had not conspired and instead had disclosed the truth, Plaintiffs would have been able cease investing and reduce its losses.

122. Plaintiffs are entitled to recover the damages incurred as a result of defendants' conspiracy.

DAMAGES

122. By reason of the aforesaid acts, all of which constitute material violations and breaches of Defendants' obligations to the Plaintiff both under the laws and Statutes of this Commonwealth or any other jurisdiction whose laws are applicable to this case as well as under the Franchise Agreements identified herein, Plaintiffs have been harmed as heretofore alleged.

**WHEREFORE**, Plaintiffs demand judgment as follows:

a. Rescission of the First Franchise Agreement, the Second Franchise Agreement and any other Franchise Agreement and all Related Agreements entered into by the Plaintiff together with restitution, disgorgement and return of all moneys paid by Plaintiffs to Defendants to date, the total amount of which is believed to be 1.7 million dollars.

b. An award of its actual damages sustained, but in no event less than $1.7 million;

c. An award of punitive damages against each defendant in such amount as may be deeded appropriate by a trier of fact;

d. An award of multiple damages under CFA and the FPA;

e. An award of attorneys' fees; and

f. Costs, disbursements and such other and further relief, including declaratory relief, as the Court deems just and proper.

JURY DEMAND

123. Plaintiffs demand a jury trial on all such issues triable by jury.

Respectfully submitted,

**FOX ROTHSCHILD, LLP**

By: ______________________________

Ely Goldin, Esquire (EG-0242)
1250 South Broad Street, Suite 1000
Post Office Box 431
Lansdale, PA 19446
(215) 661-9487 (tel)
(215) 699-0231 (fax)
E-Mail: egoldin@foxrothschild.com

Dated: October 5, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GENTLE LASER SOLUTIONS, INC., ET AL | : |
| VS. | : 1:06-CV-00665 (NLH)(JS) |
| SONA INTERNATIONAL CORP., ET AL | : JURY TRIAL DEMANDED |

**CERTIFICATE OF SERVICE**

I, Ely Goldin, Esquire, do hereby certify that a true and correct copy of the foregoing First Amended Complaint was mailed via first-class United States mail and served electronically, if registered, to the following counsel of record on the date indicated below:

Susan M. Verbonitz, Esquire
Jason M. Reiser, Esquire
Weir & Partners
1339 Chestnut Street
Suite 500
The Widener Building
Philadelphia, PA 19107

Ely Goldin, Esquire (EG-0242)
1250 South Broad Street, Suite 1000
PO Box 431
Lansdale, PA 19446
(215)661-9487 (tel)
(215)699-0231 (fax)
E-Mail: egoldin@foxrothschild.com

Date: October 5, 2007